## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MANUEL ACOSTA, | : | CIVIL ACTION NO. |
| *Plaintiff,* | : | 3:01CV00407 (AWT) |
| | : | |
| v. | : | |
| | : | |
| LT. WOODSON, LT. TERENZI, | | |
| LT. HOURIGAN, LT. COL. BARRY, | | |
| CAPT. WARREN, SGT. STINE & | | |
| SGT. MCGUIRE, | : | APRIL 2, 2004 |
| *Defendants.* | | |

## MEMORANDUM OF LAW SUPPORTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff has filed suit, pursuant to 42 U.S.C. § 1981, alleging that several individuals discriminated against him in his employment because he is Hispanic.  The Plaintiff is Cuban-American.  The Plaintiff has also alleged that several of the individual defendants are also liable for intentional infliction of emotional distress.  Based upon undisputed facts, the defendants respectfully request that the Court grant summary judgment on all of these claims.  Many of the actions that form the basis for the plaintiff's complaint are not "adverse employment actions" under applicable law, and there is no evidence from which a jury could reasonably infer that the plaintiff's racial or ethnic heritage had anything to do with the actions that were taken.  Furthermore, the plaintiff cannot show harassment based upon his race or ethnicity, nor can he demonstrate conduct sufficiently extreme and outrageous as to support a claim for intentional infliction of emotional distress.

## FACTUAL BACKGROUND

The plaintiff holds the rank of Trooper First Class in the Connecticut State Police. Defendants' Local Rule 56(a)(1) Statement of Material Facts Not In Dispute ("SMF"), ¶ 1.  From 1997 until 2001, Plaintiff Acosta was stationed at the South Central Office of the Statewide Narcotics Taskforce ("SNTF").  SMF, ¶ 2.  The Defendants are all officers in the State Police, who either supervised the Plaintiff, or were in his chain of command, at different periods from 1998 until May of 2001, when he left the South Central Office of the SNTF.  SMF, ¶¶ 3-10.  The plaintiff claims that each of the defendants took actions adverse to his interest because he was of Hispanic origin.  Specifically, he alleges that some of the defendants refused to allow him to attend narcotics dog training school, and he further alleges that some of the defendants harassed him and attempted to drive him from the SNTF.

Late in 1997, the plaintiff first expressed an interest in attending narcotics dog training school.  SMF, ¶ 11.  He submitted a memorandum indicating his interest on January 15, 1998.  Id.  Such memoranda are normally forwarded, through the chain of command, to the unit commander (in this case, the captain commanding the SNTF) for approval, and then sent to the Canine Training Unit.  See Woodson Aff., Documentary Appendix ("App.") at 20, ¶ 3; Rodino Aff., App. at 16, ¶ 3.  However, Trooper Acosta's first memorandum was not sent to the Canine Training Unit; Lieutenant Woodson indicated that he supported the application, and intended to forward it to the commander of the SNTF, but could find no evidence that he had actually done so.  Woodson Aff., App. at 20, ¶ 3.  As a result, Trooper Acosta was not eligible for the next training course.

<u>Id</u>.[1]  At the suggestion of the SNTF commanding officer, Lieutenant Woodson indicated to the plaintiff that he would be put in for the next class.  <u>Id</u>.

The State Police Canine Training Unit runs classes for different types of dogs used in police work, including narcotics dogs, and runs courses for members of the State Police, but also for other police departments, such as municipal police departments.  SMF, ¶ 14.  The unit attempts to obtain dogs for all officers who have been approved for training, but is not always able to do so.  SMF, ¶ 13.  From the time that Trooper Acosta first expressed an interest in attending narcotics dog training in January of 1998, until December of 2001 (by which time, Trooper Acosta had left SNTF), the Canine Training Unit only held four classes for narcotics dogs.  Rodino Aff., App. at 16-17, ¶ 5.  Of these classes, one did not include any members of the State Police, and another did not include any members of the SNTF.  <u>Id</u>.  However, two dogs already assigned to the SNTF became available during the time that Trooper Acosta was in the South Central Office.  SMF, ¶ 16.  Since the Canine Unit had no additional dogs to give to the SNTF, the head of the Canine Unit, Sergeant Rodino, referred the decision of which SNTF officers should be assigned the dogs to the SNTF itself.  Rodino Aff., App. at 17, ¶ 6.  The SNTF commander (by that time, Captain Peter Warren) assigned one of the dogs to Trooper William Bundy, who had already successfully completed a police dog training course.  Woodson Aff., App. at 21, ¶ 4.  The other dog was assigned to Trooper Roberto Diaz who, like the plaintiff, is of Hispanic origin.  SMF, ¶ 16.  From 1998 until 2001, eight members of the SNTF had

---

[1] The next training class was held in April of 1998; in any event, it did not include any members of the SNTF.  Rodino Aff., App. at 16-17, ¶ 5.

narcotics dogs during some or all of the period; of those eight officers, three were of Hispanic origin.  SMF, ¶ 17.

In addition to the narcotics dog school issue, the plaintiff alleges that several of the defendants harassed him, based upon his protected class status, in an attempt to get him to leave the SNTF.  The factual basis for the claim appears to rest on three "jokes" that were posted in a common area of the South Central Office of the SNTF which have some connection to his Cuban or Hispanic heritage (SMF ¶ 27), and on several disciplinary or counseling actions that took place while he was in the South Central Office.  He claims that Sergeant John McGuire "got in [his] face and started yelling at" him over paperwork that he had "screwed up on" some time in July of 1999. Acosta Dep., App. at 57, line 24 – 58, line 17.  He also claims that he was treated unfairly because he was given a negative "Performance Observation Report" and "Performance Evaluation Report" in 2001, and that he was unfairly disciplined for improperly disclosing confidential information in 2001.  Acosta Dep., App. at App. at 71, lines 8-21, and at 78, lines 1-4, and at 75, line 7 - 77, line 19.

The "Performance Observation Reports" are used by the Department of Public Safety as a mechanism for providing troopers with feedback between rating periods. They are not part of a trooper's permanent file, and are not subject to grievance or arbitration proceedings unless and until they are incorporated in the annual ratings review, called the "Performance Evaluation Report."  SMF, ¶ 20.  In the instant case, the negative Performance Observation Report that the plaintiff complains of was prepared by one of the defendants (Sergeant Blake Stine), but the more important document – the annual Performance Evaluation Report – was not.  SMF, ¶¶ 19-21.  However, since

the negative Performance Observation Report was incorporated into the Performance Evaluation Report, the plaintiff had an opportunity – of which he availed himself – to file a grievance and send the matter to arbitration.  That process is still pending.  SMF, ¶ 22.

The final action complained of, and the only truly "disciplinary" action taken against the plaintiff, was a five-day suspension (served by forfeiture of five accrued days of leave, other than sick leave), imposed in 2001.  See SMF, ¶ 26.  This disciplinary action was taken after an Internal Affairs investigation, conducted by and under the supervision of officers unrelated to the defendants, concluded that the plaintiff had engaged in conduct unbecoming an officer and the violation of several Departmental Directives.  The plaintiff had deliberately and improperly copied a confidential work plan for an upcoming undercover operation, and had given it to his union steward as evidence of complaints that he had with his management.  SMF, ¶¶ 23-26.

## PROCEDURAL HISTORY

Plaintiff filed his initial complaint in this matter on March 15, 2001, naming the defendants presently in the suit, as well as former Commissioner Henry Lee, Commissioner Arthur Spada, the Connecticut State Police and the Department of Public Safety.  Defendants filed a motion for more definite statement in June of 2001, which was granted on July 17, 2001.

On November 14, 2001, the Defendants filed a Motion to Dismiss the Amended Complaint.  On July 24, 2002, the Motion to Dismiss was granted in part and denied in part.  Specifically, the Court dismissed all claims against the State Police, the Department of Public Safety, and the present and former Commissioners of Public

Safety.  The Court also dismissed the plaintiff's equal protection claims, and his claims of retaliation for exercise of First Amendment rights of free speech and to petition for redress of grievances.  The Court specifically found that the plaintiff could not make a retaliation claim based upon a grievance that he had filed nine years earlier against someone who was not even a defendant in the present lawsuit.  Memorandum of Decision, at 20 (July 24, 2002).  The Court did find, however, that the complaint was sufficient to state a cause of action under 42 U.S.C. § 1981 against all of the remaining defendants, and was sufficient to state a cause of action under Connecticut tort law for intentional infliction of emotional distress against defendants Woodson, Hourigan, Stine, and McGuire.  Id. at 21-25.

The Court ordered the plaintiff to file an amended complaint "including only those claims that have not been dismissed, and naming in the caption only the defendants remaining in the case."  Id. at 29.  However, the plaintiff's amended complaint retained allegations about the "pattern and practice" of the Department of Public Safety and the Connecticut State Police "for a long time prior to" the events in the complaint, and also retained detailed allegations concerning the plaintiff's nine-year old discrimination complaint.  Third Amended Complaint, Count I, ¶¶ 12-18.

The Defendants now move for summary judgment on the remaining allegations in the complaint.  As set forth more fully below, the defendants are entitled to judgment as a matter of law based upon material facts that are not in dispute.

### LEGAL STANDARD FOR GRANTING A MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, this Court should grant summary judgment when "there is no genuine issue as to any material fact . . .

and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In cases such as this, where the movant is the defendant, that party must demonstrate that the nonmoving party, the plaintiff, lacks evidence to support an essential element of his claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The movant's burden is "discharged by showing - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id.

Once the movant has met this initial burden, the opposing party must present evidence establishing a material issue of fact. Celotex, 477 U.S. at 325. The nonmoving party must go "beyond the pleadings" and present evidence designating "specific facts showing that there is a genuine issue for trial." Id. at 324. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

To grant a motion for summary judgment in favor of the defendant, the court does not need to find that there is literally no evidence in favor of the plaintiff. "The judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed.'" Liberty Lobby, 477 U.S. at 252.

Thus, an issue is not genuine if it is unsupported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." Liberty Lobby, 477 U.S. at 250. "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.  A fact is not material unless it is, under controlling substantive law, an essential element of the nonmoving party's case with respect to which he has the burden of proof at trial.  Id. at 248.  Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every essential element of his case so as to create a genuine issue for trial.  Celotex, 477 U.S. at 323; Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995), *quoting* Celotex.

## ARGUMENT

### I.    THE COURT SHOULD GRANT THE DEFENDANTS SUMMARY JUDGMENT ON THE PLAINTIFF'S SECTION 1981 CLAIM

As this Court has held, to establish a claim under 42 U.S.C. § 1981, the plaintiff must allege facts supporting three key elements:  (1) that he is a member of a racial minority; (2) that the defendants intended to discriminate on the basis of race; and (3) that the discrimination concerned one of the statute's enumerated activities.  Acosta v. Woodson, Civ. No. #:01-CV00407 (AWT), Ruling on Motion to Dismiss, at 22 (July 24, 2002), quoting Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 1999), reh'g & reh'g en banc denied, 235 F.3d 769 (2d Cir. 2000),  cert. denied, 534 U.S. 816 (2001). Furthermore,

> Any discrimination must have been intentional and purposeful and the plaintiff's race must have been the motivating factor behind the defendant's discriminatory acts.  See Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988).  Naked assertions by a plaintiff that race was a motivating factor – without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race – are too conclusory to allege a § 1981 violation.  Yusuf v. Vassar College, 827 F. Supp. 952,

955 (S.D.N.Y. 1993), aff'd in part and rev'd in part, 35 F.3d 709 (2d Cir.
1994).

Brown v. Middaugh, 41 F. Supp. 2d 172, (N.D.N.Y. 1999).  The most critical flaw

in the plaintiff's case is a complete dearth of evidence that any of the defendants

took any actions against him because of his race.

    There are, in essence, two types of actions under Section 1981 as it

applies to employment discrimination.  The first is a claim of disparate treatment,

and the second is a claim of hostile work environment.  It is not entirely clear

which theory the plaintiff is pursuing; accordingly, both will be analyzed.

**A.    Summary Judgment Is Appropriate on the Plaintiff's Disparate
Treatment Claim**

    Section 1981 cases involving allegations of disparate treatment in employment

employ the same burden-shifting model used to analyze Title VII cases.  See, e.g.,

Hunter v. St. Francis Hospital, 281 F. Supp. 2d 534, 541 (E.D.N.Y. 2003).

> Under this standard, the plaintiff must first establish a prima facie case of
> discrimination by demonstrating that (1) he is a member of the protected
> class (race/age); (2) he performed his job satisfactorily; (3) he suffered an
> adverse employment action; and (4) the adverse employment action
> occurred under circumstances giving rise to an inference of discriminatory
> intent.
>     . . . .
>
>     If the plaintiff successfully demonstrates the elements of a prima
> facie case, the burden . . . shifts to the employer to articulate some
> legitimate non-discriminatory reason justifying the alleged improper
> employment action.  In meeting its burden, the employer need not
> persuade the court that it was motivated by the reason it provides; rather,
> it must simply articulate an explanation that, if true, would connote lawful
> behavior.
>
>     Once the employer meets its burden, the presumption of
> discrimination drops out of the picture.  At this point, to defeat summary
> judgment . . . the plaintiff's admissible evidence must show circumstances
> that would be sufficient to permit a rational finder of fact to infer that the

defendant's employment decision was more likely than not based in whole
or in part on discrimination.

Id. at 541-42 (citations and quotations omitted).  Furthermore, while an individual
defendant may be liable under Section 1981, such a claim "must be predicated
on the actor's personal involvement."  Whidbee v. Garzarelli Food Specialties,
Inc., 223 F.3d 62, 75 (2d Cir. 2000).  Mere negligence in supervision is not
sufficient to constitute "personal involvement" in the allegedly discriminatory
action.  Id.

Here, there is no question that the plaintiff is a member of a protected
class.  The remainder of the elements of his prima facie case are problematic,
however.  Even if the plaintiff could meet this de minimis threshold, the
Department can articulate a legitimate, non-discriminatory reason for its actions.
Plaintiff has, in the end, no evidence from which a reasonable jury could infer
discriminatory intent.  Furthermore, the plaintiff lacks evidence sufficient to
support individual liability.  Each of the plaintiff's claims of adverse employment
actions will be addressed in turn.

1.     **The Plaintiff's Allegations Concerning Dog Training
School Are Legally Insufficient to Establish Disparate
Treatment**

The complaint alleges that Defendants Woodson, Terenzi, Warren, and
Barry prevented the plaintiff from attending narcotics dog training classes, a
predicate to being assigned a narcotics dog.  See Third Amended Complaint,
Count I, ¶¶ 20, 25, 28, 31, 32, Count III, ¶¶ 35 & 36;  Count IV, ¶ 36; Count V, ¶

36.[2]  The first key question is whether this allegation, even if true, constitutes an "adverse employment action."

The rule in this circuit is that an adverse employment action is a "<u>materially</u> adverse change in the terms and conditions of employment"; one that is "more disruptive than a mere inconvenience or an alteration of job responsibilities" such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities," or similar actions.  <u>Sanders</u> v. <u>New York City Human Resources Administration</u>, 2004 U.S. App. LEXIS 4892, *10 (2d Cir., March 16, 2004) (emphasis added).  Here, the plaintiff's claim is that he was denied an opportunity <u>not</u> to alter his job responsibilities.  Although narcotics dog handlers get a stipend for care of their dog, their base salary does not change.  SMF, ¶ 18.  Plaintiff also has claimed that he would have had extra opportunities for special overtime if he had been assigned a narcotics dog.  Acosta Dep., App. at 83, lines 9-20.  In the end, however, plaintiff is alleging no more than a failure to allow him to do a particular job that he wanted to do, at the same office, in the same job title and classification, with the same base pay.  This is not a "materially adverse" employment action.

The second important problem with this allegation of malfeasance is that it did not occur under circumstances that could reasonably give rise to an inference of discriminatory intent.  This critical causal connection between the plaintiff's

---

[2] Counts VI through XI of the complaint, which address defendants Stine, McGuire, and Hourigan, do not contain any references to dog training school.  Thus, this allegation appears to be confined to Defendants Woodson, Terenzi, Warren, and Barry.

race and the claimed adverse action may be established through "evidence such as disparate treatment of fellow employees . . . or directly through evidence of . . . animus directed against a plaintiff by the defendant." Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003).  There is no such evidence in this case.

From the time that the plaintiff first expressed an interest in narcotics dog training until he left the Statewide Narcotics Task Force, SNTF only had two narcotics dogs that were available for training.  SMF, ¶¶ 15-16.  Of those two, one was assigned to a Caucasian officer who had successfully completed training with other police dogs, and the other was assigned to a Hispanic officer. SMF, ¶ 16.  Furthermore, during this same time period, only eight members of the Statewide Narcotics Task Force had narcotics dogs, and of those eight, three were Hispanic.  SMF, ¶ 17.  No rational jury could infer intent to discriminate against Hispanics on these facts.

Nor has the defendant pointed to anything that could give rise to an inference of discrimination based on the conduct of the defendants whom he alleges denied him the opportunity to attend narcotics dog training.  At his deposition, the plaintiff indicated that he was not in "the in crowd" that would get particular assignments, such as dog training school.  See, e.g., App. at 51, lines 15-17.  The reason the plaintiff gave for not being in the "in crowd," however, is that he had filed a discrimination claim against another Sergeant (not a defendant in this case) back in 1990.  App., at 41, lines 16-21.  This Court has already stricken the plaintiff's claims of retaliation based upon this 1990 complaint, which was made nine years prior to the events that form the basis for the

complaint at bar.  See Ruling on Motion to Dismiss, at 20-21.  As a matter of law, any

such retaliation claim is not actionable under Section 1981.[3]

The Plaintiff specifically testified that he had never heard Colonel Barry,

Lieutenant Woodson, Lieutenant Terenzi, or Captain Warren make any remarks

indicating any bias against Cuban Americans or Hispanic people, nor had anyone told

him that they heard these individuals make any such remarks.  Acosta Dep., App. at 39

(Barry), 43-46 (Warren), 53-54 (Terenzi), 60-61 (Woodson).  The plaintiff had no

personal knowledge of any facts from which a reasonable jury could conclude that

Defendants Barry, Woodson, Terenzi, or Warren refused to send him to narcotics dog

training school on the basis of his race.  In the absence of such facts, the plaintiff cannot

make out a prima facie case of race discrimination under Section 1981 based upon his

inability to get into narcotics dog training school.


### 2.    The Plaintiff's Claims Concerning Disciplinary or Counseling Action Are Without Merit

In addition to alleging that the defendants failed to allow the plaintiff to attend

narcotics dog training school, the plaintiff alleged that certain of the defendants took

---

[3] In Hawkins v. 1115 Legal Service Care, 163 F.3d 684, 693 (2d Cir. 1998), the Second
Circuit held that a retaliation claim under Section 1981 had to be predicated on
retaliation for an assertion of rights that were themselves protected by Section 1981.
Prior to the passage of the Civil Rights Act of 1991, Section 1981 only prohibited
discrimination based on contract formation and not contract performance.  Patterson v.
McLean Credit Union, 491 U.S. 164, 179 (1989).  Since the plaintiff's allegations of
discrimination in 1990 related to an ongoing employment relationship, and not to
"contract formation," such allegations were not protected by Section 1981 at the time.
Consequently, they cannot form the basis for a retaliation claim under Section 1981
today.  Hawkins, 163 F.3d at 694.

disciplinary or counseling action against him in an effort to get him to leave the Department.  See Third Amended Complaint, Count I, ¶¶ 28, 29, 30; Count VI, ¶ 37; Count VIII, ¶ 40, Count X, ¶ 43.  The defendants whom he alleges were involved in this effort are Lieutenants Woodson and Hourigan and Sergeants Stine and McGuire. During his deposition, the Plaintiff identified four specific incidents when he was disciplined or counseled.  First, he indicates that Sergeant McGuire "got in [his] face and starting yelling at [him] for a document process that he admitted he "screwed up on." App. at 58, lines 10, 16-17.  Second, the plaintiff indicated that he was given a negative performance observation report on April 12, 2001, by Sergeant Stine, and a negative performance evaluation in September of 2001 by a non-defendant, Sergeant Marchio. App. at 71, lines 8-21, and at 78, lines 1-4.  Finally, the plaintiff indicated that he was disciplined for giving a classified document to a union steward.   App. at 75, line 7 - 77, line 19.

a.    Verbal Discipline Is Not An Adverse Employment Action

The plaintiff has admitted that he "screwed up on" a document process and was verbally reprimanded for doing so by Sergeant McGuire.  Even accepting as true (as defendants must, for purposes of this motion only) plaintiff's allegation that this verbal reprimand was done in public and in an unprofessional manner, the allegation remains insufficient as a matter of law to show disparate treatment.  "[M]ere nastiness of colleagues or supervisors, or unprofessional behavior, is . . . not considered adverse employment action for purposes of § 1983." Carlucci v. Kalsched, 78 F. Supp. 2d 246, 256 (S.D.N.Y. 2000), citing Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 n.3 (2d Cir. 1996).

      b.    The Negative Performance Observation Report Is Not an <u>Adverse</u> <u>Employment Action</u>

The Second Circuit has indicated that a negative evaluation <u>can</u> be an adverse employment action, but is not invariably so:

> It hardly needs saying that  a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an  adverse employment action.  See <u>Smart</u> v. <u>Ball State Univ</u>., 89 F.3d 437, 442-43 (7th Cir. 1996) (plaintiff's negative job evaluations alone do not establish an adverse employment action for purposes of retaliation prima facie case).

<u>Weeks</u> v. <u>New York State</u>, 273 F.3d. 76, 86 (2d Cir. 2001); <u>see also</u> <u>Sanders</u> v. <u>New York City Human Resources Admin</u>., 2004 U.S. App. LEXIS 4892, *11 (2d Cir., Mar. 16, 2004) (where plaintiff offered no proof that the evaluation had a negative impact on the terms and conditions of the plaintiff's employment, jury could find that the evaluation did not constitute a materially adverse action by the employer).

Here, the plaintiff is complaining about a negative Performance Observation Report ("POR") from defendant Stine.  These PORs are only interim reports, designed to provide feedback to the employee during the rating period.  SMF, ¶ 20.  Performance Observation Reports are not part of a trooper's permanent file, nor are they subject to grievance or arbitration unless and until they are included in the final "Performance Evaluation Report."  <u>Id</u>.

Here, the negative POR that Sergeant Stine wrote <u>was</u> referenced in the negative Performance Evaluation Report that the plaintiff received for the year.  SMF, ¶ 21.  However, as discussed more fully below, that decision was made by a non-defendant, and is presently the subject of a grievance.  The action of the

defendant, Sergeant Stine, in issuing the negative POR, was not itself an

"adverse employment action."

        c.     The Issuance of the Negative Performance Evaluation
                  Report Cannot Be Imputed to any of the Defendants

      The third disciplinary or counseling action taken against the plaintiff was a

negative Performance Evaluation Report ("PER"), which was issued in August of

2001 by Sergeant Joseph Marchio.  Unlike a Performance Observation Report, a

Performance Evaluation Report is based upon performance over a full year, and

is a part of an officer's permanent record.  SMF, ¶ 12.  It is not clear that even a

negative PER is an "adverse employment action" as defined by such cases as

Weeks v. New York State, 273 F.3d. 76, 86 (2d Cir. 2001), and Sanders v. New

York City Human Resources Admin., 2004 U.S. App. LEXIS 4892, *11 (2d Cir.,

Mar. 16, 2004), discussed above.  Even if it constituted such an action, however,

the Performance Evaluation Report still could not serve as the basis for a Section

1981 action against the defendants in this case.

      The plaintiff's August, 2001 PER was not prepared by any of the

defendants in this case.  There were two sergeants supervising the South

Central Office of the Statewide Narcotics Task Force in 2001:  Defendant Blake

Stine and Sergeant Joseph Marchio.  Because the Plaintiff had brought this suit

against Sergeant Stine, Sergeant Marchio was the one who prepared the

plaintiff's annual PER.  SMF, ¶ 21.  This was done precisely to remove any

appearance of bias or impropriety.  Id.  Although Sergeant Stine reviewed the

report, he made no changes in it.  SMF, ¶ 21.  Thus, the findings and conclusions

are those of Sergeant Marchio alone.  Marchio Aff., App. at 4, ¶ 5.  A Section

1981 suit against an individual "must be predicated on the actor's personal

involvement"; even negligent supervision is insufficient to make out a claim.

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000).

Accordingly, there is no factual or legal basis for imputing Sergeant Marchio's

action to any of the other individual defendants.

      Furthermore, the plaintiff exercised his rights, under the union contract, to

file a grievance concerning the negative Performance Evaluation Report and the

attached negative Performance Observation Report.  SMF, ¶ 22.  This grievance

process is still ongoing.  Id.  Thus, the action is not even "final" at this time.

Before it becomes final, moreover, the negative evaluations will be reviewed by

an impartial third party.  Under these circumstances, the action is not final, and

cannot be imputed to the defendants.

      d.    Plaintiff's Five-Day Suspension Was Not Done Under
              Circumstances that Give Rise to Any Inference of
              Discrimination

      The plaintiff was, indisputably, subject to one "adverse employment

action:"  he was suspended for five days, served by forfeiture of five accrued

days of leave other than sick leave.  SMF, ¶ 26.  Although this suspension is

clearly an adverse employment action, however, it was not done under

circumstances that can give rise to an inference of discrimination against these

defendants; thus, the plaintiff cannot make out a prima facie case.  Moreover, the

plaintiff's admitted actions provide ample reason for the adverse employment

action that was taken.

The factual predicate for the plaintiff's five-day suspension is not in dispute.  The plaintiff heard about an undercover operation that was being organized for an upcoming weekend.  He was unhappy that he had not been selected to participate in the operation, and decided to complain to his union steward.  He removed a confidential document from another employee's desk that contained the work program for the operation, made an unauthorized copy of it, and gave it to his union steward prior to the date of the operation.   Acosta Dep., App. at 75, lines 10-13.  The plaintiff admits that it was "against policy" to provide the document to his union steward (App. at 76, line 25), and admitted that he "was wrong for that."  (App. at 77, lines 16-17).  No discipline was imposed until after a full internal affairs investigation of the incident – an investigation that was not conducted by any of the defendants to this lawsuit. SMF, ¶¶ 25-26.  Moreover, the plaintiff resolved any dispute about the incident by signing a Stipulated Agreement that included the suspension.  App. at 12-15.  Of the four signatories to that agreement, only one – Captain Warren – is a defendant in this case.

In light of the plaintiff's acknowledgment that his actions giving rise to the suspension were against policy and wrong, the plaintiff's agreement to the suspension, and the plaintiff's admission that he had never heard Captain Warren make any remarks indicating any bias against Cuban Americans or Hispanic people, nor had anyone told him that they heard him make any such remarks (Acosta Dep., App. at 43-46), no reasonable juror could conclude that

the discipline was imposed under circumstances giving rise to an inference of

discrimination.

**B.    The Defendants Are Entitled To Summary Judgment to the Extent that <u>the Complaint Can Be Said to State a Hostile Work Environment Claim</u>**

It is not clear from the complaint that the plaintiff is attempting to make a hostile

work environment claim under Section 1981.  To the extent that his complaint can be so

read, however, the defendants are entitled to summary judgment.

The Second Circuit analyzes Section 1981 suit alleging hostile work environment

using the same standards that apply in Title VII cases:

> As under Title VII, a hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive.  In order to survive summary judgment . . . a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.
>
> Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment.

<u>Whidbee</u> v. <u>Garzarelli Food Specialties, Inc</u>., 223 F.3d. 62, 69 (2d. Cir. 2000)

(internal quotation marks and citations omitted); <u>see also</u> <u>Schwapp</u> v. <u>Town of

Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) ("instead of sporadic racial slurs, there

must be a steady barrage of opprobrious racial comments") (internal quotation

marks omitted).  To decide whether the threshold of a hostile work environment

has been established, courts examine "the case-specific circumstances in their

totality and evaluate the severity, frequency, and degree of the abuse" and

"whether it is physically threatening or humiliating, or a mere offensive utterance .

. . ." <u>Alfano</u> v. <u>Costello</u>, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotations and

citations omitted).  Most critically, it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise the federal courts will become a court of personnel appeals."  Id. at 377.

The final element that must be considered is personal involvement.  Since these claims have been brought against individuals, and not against the Department of Public Safety, the plaintiff must establish the personal involvement of each individual defendant – an involvement that must go beyond negligent supervision.   Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000).

The plaintiff has complained that defendants Woodson, Hourigan, Stine, and McGuire engaged in a "campaign of harassment, abuse and documentation" intended to drive him from the Department.  See, e.g., Third Amended Complaint, Count I, ¶¶ 28, 29, 30; Count VI, ¶ 37; Count VIII, ¶ 40, Count X, ¶ 43.  The actions that might be taken to be disciplinary in nature have been discussed in the preceding section of this brief. Critically, however, there is next to no evidence that these personnel decisions had anything to do with the plaintiff's race.

During his deposition, the plaintiff complained that he was subject to racial slurs or jokes concerning his Hispanic and/or Cuban background.  Almost all of the complaints, however, involved the 1990 incident with Sergeant Barger that formed the basis for his earlier complaint.  Of the defendants in this suit who are alleged to have engaged in this "campaign of harassment," the plaintiff was able to provide no evidence that their alleged actions were motivated by race or ethnicity.

With respect to Lieutenants Hourigan and Woodson, the plaintiff indicated that he had never heard either make any comments indicating a bias against Cuban Americans or Hispanic people, and he was unaware of any action taken by either lieutenant that would indicate any bias against Hispanic people, other than his belief that they did not treat him well.  App. at 55, lines 8-22; and at 60, line 17 – p. 61, line 6.  The only basis for the plaintiff's allegation that their actions were motivated by race was his "belief" that they were retaliating against him for his 1990 discrimination complaint.  App. at 55, line 23 – p. 57, line 20; and at 61, line 7 – p. 63, line 1.

With respect to Sergeant McGuire, the plaintiff alleges that he sometimes referred to Hispanic people as "paco," that he posted a joke at the plaintiff's expense on a bulletin board at work, and that he was the supervisor when other such "jokes" were posted.  Acosta Dep., App. at 64, lines 20-22, and at 65, line 1 – p. 70, line 9.  Of the posted jokes, only three, by the plaintiff's own admission, had anything to do with the plaintiff's ethnic heritage.  Acosta Dep., App. at 70, lines 2-11.[4]  Plaintiff also indicated that jokes at the expense of other troopers were also posted, including troopers who were not members of a protected class.  Acosta Dep., App. at 69, lines 4 – 12.

The plaintiff alleges that Sergeant Stine was aware of these posted jokes and did nothing about them.  Acosta Dep., App. at 80, lines 5-17.[5]  Other than that, the plaintiff indicates that he never heard Sergeant Stine make any remarks indicating a bias

---

[4] Copies of the three "jokes" were entered as exhibits during the plaintiff's deposition, and are included at pages 84-86 of the Appendix.  Although inappropriate and in poor taste, none are in any way threatening.

[5] The plaintiff indicated that he "assumed" that Sergeant Stine was responsible for one of the "jokes," but did not know that was so.  Acosta Dep., App. at 68, line 25 – p. 69, line 1.

against Cuban Americans or Hispanic people, or heard from other people that he had made any such remarks.  Acosta Dep., App. at 80, line18 – p. 81, line 21.

In a nutshell, to the extent that the plaintiff is claiming that he was subjected to a hostile work environment because of his race, he could point to only three jokes and the use (by one supervisor) of the term "paco", in the course of all of his interactions with the defendants while he was in the South Central Office of the Statewide Narcotics Task Force, that have <u>anything</u> to do with his racial or ethnic background.  Of the three jokes, his personal knowledge only connects one to any of the defendants.  These incidents were not severe, or frequent, nor were they physically threatening.  <u>See</u> <u>Alfano</u> v. <u>Costello</u>, 294 F.3d 365, 374 (2d Cir. 2002).   Certainly three such incidents in the course of as many years cannot be described as a "steady barrage of opprobrious racial comments."  <u>Schwapp</u> v. <u>Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997).  Thus, if the complaint is read to allege a hostile work environment claim, it simply cannot withstand summary judgment.

## II.    THE COURT SHOULD DISMISS THE PLAINTIFF'S STATE LAW CLAIMS, OR, IN THE ALTERNATIVE, SHOULD GRANT THE DEFENDANTS SUMMARY JUDGMENT

In addition to his Section 1981 claims, the plaintiff has alleged that Defendants Hourigan, Woodson, Stine and McGuire intentionally caused him emotional distress.  <u>See</u> Third Amended Complaint, Counts II, VII, IX, and XI.  In the event that the Court grants the defendants' motion for summary judgment on the federal law claims, it should decline to exercise jurisdiction over the state tort law claim.  The Second Circuit has clearly indicated that state law claims should be dismissed when all federal claims have failed:

> [T]he Supreme Court has stated that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness and comity -- will point toward declining jurisdiction over the remaining state-law claims.

Lanza v. Merrill Lynch & Co., 154 F.3d 56, 61 (2d Cir.1998), quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

If the Court decides to address the allegations of emotional distress on their merits, it should grant summary judgment with respect to these claims. This Court found, at the pleadings stage, that the plaintiff's emotional distress claims against Defendants Woodson, Hourigan, Stine and McGuire were sufficient to withstand a motion to dismiss. However, now that the factual basis for the allegations has been further developed through discovery, the Court should find that these defendants are entitled to summary judgment as a matter of law.

Under Connecticut law, the four elements of a claim for intentional infliction of emotional distress are:

> (1) that the actor intended to inflict emotional distress or that he knew or reasonably should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

Appleton v. Board of Educ., 254 Conn. 205, 210, 757 A.2d 1059, 1062 (2000) (internal quotations and citations omitted.). Even accepting as true, for the purposes of this motion, the plaintiff's claim that the four defendants intended to cause him emotional distress, the actual conduct that the plaintiff complains of simply is not "extreme and outrageous" under Connecticut law.

Liability requires conduct "exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." Petyan v. Ellis, 200 Conn. 243, 254 n.5, 510 A.2d 1337, 1342 (1986), quoting W. PAGE KEETON ET AL., PROSSER KEETON ON THE LAW OF TORTS, § 12, p. 60 (5th Ed. 1984). The focus, with respect to this prong of the test, is on the nature of the conduct, rather than the intention of the alleged tortfeasor. Thus, in Dollard v. Board of Education, 63 Conn. App. 550, 553, 777 A.2d 714, 716 (2001), the court declined to find extreme and outrageous conduct when the plaintiff alleged (as defendant has here) a "concerted plan and effort to force the plaintiff to resign from her position . . . ." The court focused on the details of what the defendants were alleged to have done in furtherance of this alleged plan:

> The defendants carried out their plan by hypercritically examining every small detail of her professional and personal conduct. Specifically, the defendants transferred the plaintiff to a school where she did not want to be assigned and then secretly hired someone to replace her at the school from which she had been transferred. The defendants also publicly admonished the plaintiff for chewing gum, being habitually late, being disorganized and not using her time well. Finally, the defendants unnecessarily placed the plaintiff under the intensive supervision of a friend of [one of the defendants]. The defendants ultimately forced the plaintiff to resign.

Id. at 552-53, 777 A.2d at 716. The court concluded, after this recitation, that while the conduct alleged "may have been distressful and hurtful to the plaintiff," it was not sufficiently outrageous to support a cause of action for intentional infliction of emotional distress. Id. at 555, 777 A.2d at 717; see also Appleton v. Board of Educ., 254 Conn. 205, 211, 757 A.2d 1059, 1063 (2000) (conduct not extreme and outrageous when plaintiff alleged the her employers subjected her to condescending comments in front of

colleagues, subjected her to psychiatric examinations, discussed her mental health with her daughter, had police escort her from the work premises, suspended her employment and forced her to resign); Carnemolla v. Walsh, 75 Conn. App. 319, 332-33, 815 A.2d 1251, 1260-61 (2002) (conduct not extreme or outrageous when plaintiff was accused of criminal conduct by her employer, and presented with documents for her signature that purported to be resignation and release forms), appeal denied, 263 Conn. 913, 821 A.2d 768 (2003).

The conduct that forms the basis for the plaintiff's emotional distress claims cannot, either individually or taken together, meet the threshold requirement of extreme and outrageous conduct.  He alleges that (1) Defendant McGuire, on one occasion, verbally and publicly reprimanded him for an admitted mistake; (2) that Defendant Stine gave him a negative performance observation report, (3) that a non-defendant gave him a negative annual performance evaluation, (4) that Defendant Warren did not select him for a special assignment; (5) that he was disciplined (by a five-day suspension) for violating policy by turning over a confidential and sensitive plan to his union steward; (6) that he was not given overtime opportunities that he wanted to have; and (7) that several "jokes" were posted in the office that he found to be offensive.  These allegations are not as serious as those found to be inadequate in Appleton, Dollard, and Carnemolla.   Accordingly, summary judgment is appropriate for these claims.

**CONCLUSION**

For the reasons set forth above, the plaintiff has failed to make out a colorable claim under either Section 1981 or Connecticut common law.  Based upon uncontested facts, the Defendants are entitled to judgment as a matter of law.

        DEFENDANTS,
        Lt. Woodson, et al.

        RICHARD BLUMENTHAL
        ATTORNEY GENERAL

BY:_____
        Mark P. Kindall
        Assistant Attorney General
        55 Elm Street
        P.O. Box 120
        Hartford, CT 06141-0120
        Tel:  (860) 808-5340
        Fax:  (860) 808-5385
        Federal Bar No.: ct13797
        E-Mail: Mark.Kindall@po.state.ct.us

## <u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing Memorandum of Law was mailed this

2nd day of April, 2004, first class, postage prepaid to:

Robert M. Berke, Esq.
135 Elm Street
Bridgeport, CT 06604
Tel.: (203) 332-6000
Fax: (203) 332-0661

_____
Mark P. Kindall
Assistant Attorney General