UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MANUEL ACOSTA, | : | CIVIL ACTION NO. |
| *Plaintiff,* | : | 3:01CV00407 (AWT) |
| | : | |
| v. | : | |
| | : | |
| LT. WOODSON, LT. TERENZI, LT. HOURIGAN, LT. COL. BARRY, CAPT. WARREN, SGT. STINE & SGT. MCGUIRE, | : | APRIL 2, 2004 |
| *Defendants.* | | |

## DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 56(a)(1), the following material facts are not in dispute for the purpose of ruling on the present motion for summary judgment. The exhibits, affidavits, and deposition transcripts accompany this Statement as an appendix under separate cover; all page numbers referred to herein are to the Bates stamped pages of the appendix ("App.").

1. The Plaintiff, Manuel Acosta ("plaintiff" or "Acosta"), has been employed by the Connecticut State Police since January of 1987. Acosta Dep., App. at 25, lines 17-19. Since sometime in the late 1990s, the Plaintiff has held the rank of "Trooper, First Class." Acosta Dep., App. at 32, lines 3-17.

2. Plaintiff joined the Statewide Narcotics Taskforce ("SNTF") in October of 1997, and remained there until October of 2001. Acosta Dep., App. at 27, lines 8-10; and at 30, line 22 – 31, line 3. He was posted at the South Central Office of the SNTF from October of 1997 until May of 2001, and at the Eastern SNTF Office from May of 2001 until October of 2001. Acosta Dep., App. at 27, lines 11-12, and at 35, lines 2-12.

3. Lieutenant Michael Woodson was assigned to the Statewide Narcotics Task Force from July 18, 1997, until November 26, 1999. Lemley-Mulligan Aff., App. at 1, ¶ 3. He supervised several of the offices of the Statewide Narcotics Task Force, including, for part of his time with the Task Force, the South Central Office. Woodson Aff., App. at 20, ¶ 2.

4. Captain Peter Terenzi was assigned to the Statewide Narcotics Task Force as a Lieutenant from May 15, 1998, until June 18, 1999. Lemley-Mulligan Aff., App. at 1, ¶ 4.

5. Lieutenant Dale Hourigan was assigned to the Statewide Narcotics Task Force from November 26, 1999, until August 3, 2001. Lemley-Mulligan Aff., App. at 1, ¶ 5.

6. Colonel Timothy Barry was assigned to the Statewide Narcotics Task Force as a Captain (and Commanding Officer) from January 3, 1997 until December 15, 1997. From December 15, 1997 until January 21, 1998, he was the Acting Commander of the Western District of the State Police. On January 21, 1998, he was promoted to Lieutenant Colonel and placed in command of Field Operations. Lemley-Mulligan Aff., App. at 1-2, ¶ 6.

7. Major Peter Warren was assigned as Captain and the Commanding Officer of the Statewide Narcotics Task Force from January 30, 1998, until August 8, 2003. Lemley-Mulligan Aff., App. at 2, ¶ 7.

8. Major Frank Griffin was the Acting Commander of the Statewide Narcotics Task Force as a Lieutenant from December 15, 1997 until January 30, 1998. Lemley-Mulligan Aff., App. at 2, ¶ 8.

9. Sergeant Blake Stine has been assigned to the Statewide Narcotics Task Force from January 1, 1999, until the present. Lemley-Mulligan Aff., App. at 2, ¶ 9. He became the senior sergeant at the South Central Office when Sergeant Joseph Marchio replaced Sergeant John McGuire in January of 2001. Marchio Aff., App. at 3, ¶ 3.

10. Sergeant John "Jay" McGuire was assigned to the Statewide Narcotics Task Force from February 27, 1998, until April 19, 2002. Lemley-Mulligan Aff., App. at 1, ¶ 10. Sergeant McGuire became the senior sergeant in charge of the South Central Office when Sergeant Blake Stine replaced Sergeant Phil Confer (Acosta Dep., App. at 36, line 6 – p. 37, line 8), which occurred in January of 1999. Lemley-Mulligan Aff., App. at 2, ¶ 9. Sergeant McGuire left the South Central Office of the SNTF in January of 2001, transferring to another SNTF Office. Marchio Aff., App. at 3, ¶ 3.

11. In late 1997, the plaintiff first expressed an interest in attending narcotics dog training school. Acosta Dep., App. at 38, lines 9-16. He put this request in writing on January 15, 1998. Acosta Dep., App. at 37, lines 10-17.

12. Narcotics dog training is done at the State Police Canine Training Unit, which was run, at all relevant times, by Sergeant Kevin Rodino. Rodino Aff., App. at 16, ¶¶ 2-3.

13. The State Police Canine Training Unit attempts to obtain dogs for all State Police Officers who have been approved to attend training. When it is unable to obtain enough dogs, Sergeant Rodino informs the commanders of the units who have approved candidates for training, and they make the decisions concerning who shall attend the course. Rodino Aff., App. at 16, ¶ 3.

14. The State Police Canine Training Unit trains different types of police dogs, including narcotics dogs, and provides training for units apart from SNTF, and for other police departments, such as municipalities. Rodino Aff., App. at 16, ¶ 3.

15. From the time that the plaintiff expressed an interest in attending narcotics dog training school until the time that he left the SNTF, only two training classes were held for narcotics dogs that included any SNTF members. Rodino Aff., App. at 16-17, ¶ 5.

16. No new narcotics dogs became available for the SNTF from the time that the plaintiff first indicated his interest in attending narcotics dog school until he left the SNTF. Rodino Aff., App. at 17, ¶ 6. However, two dogs already assigned to SNTF became available during this time. Id. One was assigned to Trooper William Bundy, a Caucasian, who had already successfully completed police dog school. Rodino Aff., App. at 16-17, ¶¶ 5 and 6; Woodson Aff., App. at 21, ¶ 4. The second dog was assigned to Roberto Diaz, a Hispanic officer. Rodino Aff., App. at 17, ¶¶ 5-7.

17. From the time that the plaintiff first expressed an interest in attending narcotics dog training school until the time that he left the SNTF, only eight members of the SNTF were assigned narcotics dogs. Of those eight, three – Troopers David and Roberto Diaz, and Trooper Luis Rosa, were of Hispanic origin. Rodino Aff., App. at 17, ¶ 7.

18. Troopers who are assigned narcotics dogs after training receive a stipend for the purpose of covering expenses associated with caring for the dog. Acosta Dep., App. at 82, line 6, – 83, line 4. Their base salary is not changed. Acosta Dep., App. at 83, lines 16-18.

19. Sergeant Blake Stine gave the plaintiff a negative Performance Observation Report on April 17 of 2001, and provided a corrected version to the plaintiff on April 20, 2001. Acosta Dep., App. at 71, lines 18-19, and at 73, lines 8-10, and Exhs. 13 and 14 to that Deposition, App. at 87-90.

20. Performance Observation Reports are not placed in an officer's permanent record, and are not subject to grievance or arbitration procedures unless and until they are attached to the annual Performance Evaluation Report. They are intended to provide a mechanism for feedback between rating periods for department employees. Savitski Aff., App. at 18-19, ¶ 4. In contrast, Performance Evaluation Reports are annual reports that are placed in an employee's permanent record, and are considered for promotions and lateral assignments. Negative Performance Evaluation Reports are subject to grievance and arbitration. Savitski Aff., App. at 18, ¶ 3.

21. The plaintiff's annual Performance Evaluation Report was prepared by Sergeant Joseph Marchio, without input from Sergeant Stine. Marchio Aff., App. at 4, ¶ 5. Sergeant Marchio attached the corrected Performance Observation Report prepared by Sergeant Stine in April of 2001 to the plaintiff's Performance Evaluation Report, after independently ascertaining the facts relative to the incidents in question. Marchio Aff., App. at 4, ¶ 6. Sergeant Marchio did the evaluation because he was aware that Trooper Acosta has filed a lawsuit against Sergeant Stine, and thought the evaluation should be prepared by someone who was not the subject of the lawsuit. Marchio Aff., App. at 3, ¶4. Although Sergeant Stine reviewed the Performance Evaluation Report, he made no changes in it. Marchio Aff., App. at 4, ¶ 5.

22. Plaintiff exercised his rights under his union contract to challenge his Performance Evaluation Report, and the Performance Observation Report that was at-

tached to it. Marchio Aff., App. at 4, ¶ 7. That administrative process is still ongoing. Acosta Dep., App. at 79, lines 15-22; Marchio Aff., App. at 4, ¶ 7.

23. On or about April 20, 2001, plaintiff Acosta improperly made a copy of a confidential work program for an undercover operation scheduled for the following weekend, and gave the copy to his union steward. Acosta Dep., App. at 75, lines 10-16. He did so for the purpose of showing his union steward that he had been unfairly excluded from the undercover operation. Acosta Dep., App. at 75, lines 23-24. Plaintiff admits that it was "wrong" and "against policy" to copy and disseminate the report. Acosta Dep., App. at 76, lines 24-25, and at 77, lines 16-17.

24. The participants in the undercover operation were handpicked by the head of the SNTF, Captain Warren. Acosta Dep., App. at 148, lines 13-15. Although plaintiff Acosta was not selected, other Hispanic officers were selected. Acosta Dep., App. at 43, lines 6-10.

25. Trooper Acosta's action in copying and disseminating the work plan for the undercover operation was referred to Internal Affairs, and was investigated by Sergeant William T. Griffin, under the supervision of Lieutenant Sarah Kasacek, Commander of the Internal Affairs Unit. Marchio Aff., App. at 4, ¶ 8. The investigator recommended that the complaint be sustained and that Trooper Acosta be charged with conduct unbecoming an officer, release of confidential information, violation of general directives, and improper release of plans and orders. Executive Summary of IA Report (attachment to Marchio Aff.), App. at 6-8.

26. The Internal Affairs complaint was sustained, and the matter was settled by a stipulated agreement. Marchio Aff., App. at 4, ¶ 8, and attached agreement, App.

at 12-15. As part of the stipulation, Acosta agreed to a five day suspension, served by forfeiture of five accrued days of leave, other than sick leave. App. at 14.

27. During the time that he was in the South Central Office of the SNTF, several drawings were posted in the large room at the office; some involved Trooper Acosta, and some were about other officers, including officers who were not members of a protected class. Acosta Dep., App. at 65, line 11-12, and at 69, lines 1-12. Plaintiff identified three of the drawings as being harassment based upon his being Hispanic or Cuban. Acosta Dep., App. at 70, lines 4-8, and Exh. 7, 8, and 9 from that Deposition.

DEFENDANTS,
Lt. Woodson, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:_____
Mark P. Kindall
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5385
Federal Bar No.: ct13797
E-Mail: Mark.Kindall@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Rule 56(a)(1) Statement was mailed this 2nd day of April, 2004, first class, postage prepaid to:

Robert M. Berke, Esq.
135 Elm Street
Bridgeport, CT 06604
Tel.: (203) 332-6000
Fax: (203) 332-0661

_____
Mark P. Kindall
Assistant Attorney General