# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

Manuel Acosta

Lt. Woodson, Lt. Terenzi
Lt Hourigan, Lt Col. Barry
Capt Warren, Sgt Stine
and Sgt. McGuire

2006 OCT 13  A 11: 21

CIVIL CASE NO. 3:01CV00407 (AWT)

### NOTICE OF APPEAL

1. Pursuant to F. R. A. P. 4(a)(1), **Manuel Acosta** hereby gives notice and
   (appealing party)
appeals to the United States Court of Appeals for the Second Circuit from the following

Judgment or Order (attach the Judgment or Order):
Civil No. 3:01CV00407 (AWT)

_____

_____

2. The Judgment /Order in this action was entered on **09-25-06**.
                                                      (date)

_Manuel Acosta_
Signature

**Manuel Acosta**
Print Name

**229 Flood Road**

**Marlborough, CT 06447**
Address

Date: **10-13-06**

**860-295-1390**
Telephone Number

Note: You  may use this form to take an appeal provided that it is received by the Office of the Clerk of the U.S. District Court within 30 days of the date on which the judgment was entered (60 days if the United States or an officer or agency of the United States is a party).

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
MANUEL ACOSTA,                :
                              :
       Plaintiff,             :
                              :
v.                            :    Civil No. 3:01CV00407(AWT)
                              :
LT. WOODSON, LT. TERENZI,     :
LT. HOURIGAN, LT. COL. BARRY, :
CAPT. WARREN, SGT. STINE,     :
and SGT. MCGUIRE,             :
                              :
       Defendants.            :
                              :
------------------------------x
```

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Connecticut State Police Trooper Manuel Acosta ("Acosta"), brings this case (1) pursuant to 42 U.S.C. § 1983 alleging violation of his rights under 42 U.S.C. § 1981 ("Section 1981"), and (2) alleging intentional infliction of emotional distress upon him by the defendants, Connecticut State Police Lt. Woodson ("Woodson"), Lt. Terenzi ("Terenzi"), Lt. Hourigan ("Hourigan"), Lt. Col. Barry ("Barry"), Capt. Warren ("Warren"), Sgt. Stine ("Stine") and Sgt. McGuire ("McGuire").

The defendants have moved for summary judgment as to all of the plaintiff's claims. For the reasons set forth below, the defendants' motion is being granted with respect to the Section 1981 claims, and the court declines to exercise supplemental jurisdiction over the plaintiff's state law claim for intentional infliction of emotional distress.

## I.    FACTUAL BACKGROUND

The plaintiff has been employed by the Connecticut State
Police since 1987 and has held the rank of "Trooper, First Class"
since sometime in the late 1990s.  At the time of the events
described in the Third Amended Complaint ("Third Am. Compl."),
Acosta was a member of the Statewide Narcotics Task Force
("SNTF").  He was posted to the South Central Office of the SNTF
from October of 1997 until May of 2001, and to the Eastern SNTF
Office from May of 2001 until October of 2001.  Each of the
defendants was assigned to the SNTF during at least part of the
time during which the plaintiff was a member of the SNTF.

The plaintiff's claims are based on a series of actions he
contends the defendants took against him.  First, Acosta claims
that Woodson, Terenzi, Warren and Barry denied him the
opportunity to attend narcotics dog training school so he could
become a narcotics dog handler, which Acosta contends is a more
prestigious position that would have led to increased overtime
pay opportunities and entitled him to a $100 per month stipend,
along with an unspecified additional amount from the federal
government.  Second, Acosta contends that Sgt. Stine gave him a
negative performance review, which was later incorporated into
Acosta's employment file by another member of the Connecticut
State Police who is not a defendant in this action.  Third,
Acosta contends that some of the defendants harassed him by

-2-

posting ethnically offensive cartoons mocking him on an office
bulletin board, and that one of those defendants, Sgt. McGuire,
verbally reprimanded him in public.

### A.   Narcotics Dog Training School

On January 15, 1998, the plaintiff submitted a request in
writing to Sgt. Kumro, a supervisor who is not a defendant in
this case, to attend the next available class at narcotics dog
training school.  That request was later received by defendant
Lt. Woodson, who testified that he supported the application but
could find no evidence that he had forwarded it to defendant
Capt. Warren, whose approval was required for the plaintiff to
attend the training class.  No member of the SNTF, including
Acosta, was invited to attend that class, which was apparently
held on April 15, 1999.

Acosta claims that when he inquired why he had been unable
to attend, defendant Lt. Terenzi told him that no dog would be
available for the plaintiff and that the plaintiff would not
attend dog training school.  Acosta then submitted an application
to attend the next class at the narcotics dog training school on
May 6, 1999, which Lt. Terenzi told him would be submitted to
Capt. Warren.

The plaintiff contends that he met with Capt. Warren on June
30, 1999 and that Warren told him that he had never received the
plaintiff's two applications for admission into the narcotics dog

-3-

training school.  When the plaintiff brought the matter to the
attention of defendant Lt. Col. Barry, Barry assured him that he
would be enrolled in the next narcotics dog training class.  An
approved application for Acosta to attend narcotics dog training
school was sent to the Canine Training Unit and was received in
September of 1999.

When a narcotics dog became available when the prior dog
handler was promoted, Lt. Woodson brought the plaintiff's
application to Capt. Warren's attention.  However, Warren
assigned the dog to Trooper Bundy, a non-minority trooper in the
SNTF who was lower in rank than the plaintiff, on the grounds
that Bundy had already successfully passed a training course for
a police dog and could be trained more quickly.  Training courses
were subsequently held in January and May of 2000 and in April of
2001, but Acosta did not attend any of these classes.  Instead,
Bundy attended the class held in January of 2000.

The only other SNTF officer to attend a dog training class
during the period the plaintiff was assigned to the SNTF was
Trooper Roberto Diaz, who attended the April 2001 class.  Trooper
Diaz was assigned a dog that had already been assigned to the
SNTF.  According to the head of the Canine Training Unit, no
additional dogs became available to the SNTF during that time and
no member of the SNTF attended the class held in May 2000.  Of
the eight officers of the SNTF who were assigned narcotics dogs

during the period from January of 1998 to December of 2001, three were of Hispanic origin.

### B.    Negative Performance Observation Report

Defendant Stine gave the plaintiff a negative Performance Observation Report on April 17, 2001 and provided a corrected version to Acosta on April 20, 2001.   Performance Observation Reports are interim evaluations and are not placed in an officer's permanent file unless they are attached to the annual Performance Evaluation Report.   Acosta's annual Perfomance Evaluation Report was prepared by Sgt. Marchio, who is not a defendant in this action.   Sgt. Marchio attached the negative Performance Observation Report from Sgt. Stine to the plaintiff's annual Performance Evaluation Report.   Acosta has exercised his rights pursuant to his union contract to challenge his Performance Evaluation Report.

### C.    Harassment by a Public Verbal Reprimand and Ethnically Offensive Drawings.

On July 16, 1999, the plaintiff overheard a conversation among Woodson, McGuire and Stine in which Woodson instructed the other two to make things difficult for Acosta.   McGuire responded that he had gotten in Acosta's face and yelled at him.   The plaintiff believes that McGuire was referring to a verbal reprimand that McGuire gave Acosta sometime in early July 1999 because the plaintiff had processed certain paperwork incorrectly.   The plaintiff contends that the reprimand was part

of an effort to make him want to leave the SNTF.  The plaintiff
also contends that a similar conversation took place
approximately a year later between defendants Hourigan, McGuire
and Stine, and that McGuire and Stine said that it was being
taken care of.

In addition, the plaintiff contends that drawings were
posted on a bulletin board in a room at the South Central Office
of the SNTF at various times.  The drawings were about a number
of different subjects, including officers who were not members of
a racial minority group.  Acosta states that some of the drawings
posted about him were not objectionable.  However, three of them
were ethnically offensive and harassing.

The plaintiff saw defendant Sgt. McGuire post one of the
drawings.  It was a picture of a dog with the word "PACO" written
across the top of the page in capital letters.  On the bottom of
the page were the words "GOOD BOY!!!"  The plaintiff assumes
defendant Stine posted another of the drawings.  However, the
only reason Acosta has offered for this assumption is that
"[i]t's just [defendant Stine's] nature to do that stuff." (Pl.'s
Dep. 102:25 - 103:3).  Acosta has stated that he does not know
who posted the third drawing.

## II.  __LEGAL STANDARD__

A motion for summary judgment may not be granted unless
the court determines that there is no genuine issue of material

fact to be tried and that the facts as to which there is no such
issue warrant judgment for the moving party as a matter of law.
Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22
F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry
of summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial."  See Celotex Corp., 477 U.S. at
322.

When ruling on a motion for summary judgment, the court must
respect the province of the jury.  The court, therefore, may not
try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire
Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce &
Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is
well-established that "[c]redibility determinations, the weighing
of the evidence, and the drawing of legitimate inferences from
the facts are jury functions, not those of the judge."  Anderson,
477 U.S. at 255.  Thus, the trial court's task is "carefully
limited to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them.  Its duty, in
short, is confined . . . to issue-finding; it does not extend to
issue-resolution."  Gallo, 22 F.3d at 1224.

-7-

Summary judgment is inappropriate only if the issue to be resolved is <u>both</u> genuine <u>and</u> related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law." <u>Id.</u>  As the Court observed in <u>Anderson</u>: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  <u>Id.</u>  Thus, only those facts that <u>must</u> be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment.  <u>See</u> <u>Howard v. Gleason Corp.</u>, 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable

inferences in its favor." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (quoting <u>Delaware & Hudson Ry. Co. v. Consol. Rail Corp.</u>, 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. <u>Stern v. Trustees of Columbia Univ.</u>, 131 F.3d 305, 315 (2d Cir. 1997) (quoting <u>Western World Ins. Co. v. Stack Oil, Inc.</u>, 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. <u>Anderson</u>, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," <u>Weinstock</u>, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical

-9-

doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial." <u>Aslanidis v. United States Lines, Inc.</u>, 7 F.3d 1067,
1072 (2d Cir. 1993)(quotation marks, citations and emphasis
omitted). Furthermore, "unsupported allegations do not create a
material issue of fact." <u>Weinstock</u>, 224 F.3d at 41.  If the
nonmovant fails to meet this burden, summary judgment should be
granted.  The question then becomes:  is there sufficient
evidence to reasonably expect that a jury could return a verdict
in favor of the nonmoving party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 248,
251.

### III. <u>Discussion</u>

Counts One, Three, Four, Five, Six, Eight and Ten of the
Third Am. Compl. assert claims for violations of Section 1981
against Woodson, Terenzi, Warren, Barry, Stine, McGuire and
Hourigan respectively.  Counts Two, Seven, Nine and Eleven assert
a state law claim for intentional infliction of emotional
distress against Woodson, Stine, McGuire and Hourigan
respectively.  The defendants have moved for summary judgment on
all eleven counts of the complaint.

#### A.    **Claims Pursuant to 42 U.S.C. § 1981**

Section 1981 states, in relevant part, that:

all persons within the jurisdiction of the United States
shall have the same right in every State and Territory to
make and enforce contracts . . . .  For purposes of this
section, the term 'make and enforce contracts' includes . .

. the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

42 U.S.C.A. § 1981(a) and (b) (West 2006).

Section 1981 prohibits discrimination based on race or ethnicity in connection with an employment contract, <u>Saint Francis College v. Al-Khazraji</u>, 481 U.S. 604, 609 (1987). In order to maintain a claim for a violation of Section 1981, the plaintiff must establish the following elements: "(1) [the plaintiff is a member] of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." <u>Brown v. City of Oneonta</u>, 221 F.3d 329, 339 (2d Cir. 1999). The second of these elements, intent to discriminate on the basis of race, is essential because Section 1981 only prohibits intentional racial discrimination. <u>General Building Contractors Ass'n v. Pennsylvania</u>, 458 U.S. 375, 391 (1982). It is also worth noting that the only defendants in this action are individuals. In order for any individual to be found liable for a violation of Section 1981, he or she must have been personally involved in the alleged violation. See <u>Whidbee v. Garzarelli Food Specialities, Inc.</u>, 223 F.3d 62, 75 (2d Cir. 2000).

A plaintiff's burden on a motion for summary judgment in a Section 1981 case is the same as that in a Title VII case. <u>See, e.g.</u>, <u>Hunter v. St. Francis Hospital</u>, 281 F. Supp. 2d 534, 541 (E.D.N.Y. 2003). If a plaintiff contends that he has suffered an

-11-

adverse employment action, he is required to come forward with a prima facie case by demonstrating that "(1) [he] is a member of the protected class; (2) [he] is qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Weinstock, 224 F.3d at 42.  If the case is not based on an adverse employment action, but instead is based on a hostile work environment, the plaintiff "must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment."  Whidbee, 223 F.3d at 69.

Because the court's analysis of the evidence, or lack of evidence, offered by the plaintiff differs depending on particular claims and the defendant at issue, the court will consider each Section 1981 claim in turn.

### 1.   Denial of Opportunity to Attend Narcotics Dog Training School: Defendants Terenzi, Woodson, Warren and Barry.

The defendants argue that they are entitled to judgment as a matter of law on the plaintiff's Section 1981 claim that he was denied an opportunity to become a narcotics dog handler because the plaintiff has not offered evidence from which a reasonable jury could conclude either (1) that preventing the plaintiff from attending narcotics dog training school was an adverse employment action or (2) that preventing the plaintiff from attending that

-12-

training school was based on discriminatory intent related to the
plaintiff's race.  The court concludes that the plaintiff has
failed to offer evidence from which a reasonable jury could
conclude that any of defendants Terenzi, Woodson, Warren or Barry
denied the plaintiff an opportunity to become a narcotics dog
handler because of his race.  Because that finding disposes of
the Section 1981 claims, the court does not reach the question of
whether the denial of the opportunity to attend narcotics dog
training school constituted an adverse employment action.

### (a)   Lt. Terenzi

The plaintiff has not offered evidence from which a
reasonable jury could conclude that defendant Terenzi was
motivated by an intent to discriminate against the plaintiff on
the basis of his race.  In his deposition, the plaintiff
acknowledged (1) that he had never heard defendant Terenzi make
any remarks indicating a bias against Cuban Americans or Hispanic
people, (2) that no one else had ever told him that they had
heard defendant Terenzi make remarks indicating a bias against
Cuban Americans or Hispanic people, and (3) that defendant
Terenzi had never taken any action the plaintiff believed
demonstrated a bias against Hispanic troopers.

When the plaintiff was asked what led him to believe that
defendant Terenzi had a bias against Hispanic troopers, the
plaintiff answered, "Because he was in that in crowd to keep me

-13-

out, just to back up what master sergeant, what Sergeant Barger
said and did." (Pl.'s Dep. 70:7-24).  When asked if there were
any other reason, the plaintiff replied, "[o]ther than dog
school, no." Id.  However, this evidence is not sufficient to
create a genuine issue as to whether Lt. Terenzi discriminated
against the plaintiff because of his race.

### (b)    Lt. Woodson

The plaintiff has not offered evidence from which a
reasonable jury could conclude that Lt. Woodson's actions were
motivated by an intent to discriminate against the plaintiff on
the basis of his race.  The plaintiff testified that he had never
heard defendant Woodson make any remarks indicating a bias
against Cuban Americans or Hispanic people and that no one else
had ever told him that they had heard defendant Woodson make
remarks indicating a bias against Cuban Americans or Hispanic
people.  When the plaintiff was asked what led him to believe
that defendant Woodson had a bias against Hispanic troopers, he
referred to the conversation he overheard during which Woodson
had discussed with defendants McGuire and Stine ways to make the
plaintiff want to leave the SNTF.  However, the plaintiff
testified that he did not hear any reference to his race during
that conversation.[1]  The plaintiff does not offer any other

---

[1]The transcript of the deposition makes reference at this point to Capt.
Warren.  However, the Third Am. Compl. and other portions of the transcript
suggest that the actual participants in the conversation were Woodson, Stine
and McGuire.

-14-

evidence in support of his contention that Woodson was biased against him because of his race, and the evidence offered is not sufficient to create a genuine issue as to whether Capt. Woodson discriminated against the plaintiff because of his race.

### (c)   Capt. Warren

The plaintiff has not offered evidence from which a reasonable jury could conclude that Capt. Warren took any adverse action motivated by an intent to discriminate against the plaintiff on the basis of his race.  As with Terenzi and Woodson, the plaintiff never heard defendant Warren make any remarks indicating a bias against Cuban Americans or Hispanic people and no one else had ever told him that they had heard Capt. Warren make any such remarks.

When the plaintiff was asked at his deposition why he believed that Capt. Warren had a bias against Hispanic troopers, the plaintiff recounted an incident in which an application from an Hispanic officer to join the SNTF was allegedly administratively mishandled.  However, the plaintiff's testimony reflects that he does not have first hand knowledge of the incident.  The plaintiff also testified that he and at least one other Hispanic trooper had joined the SNTF while Capt. Warren was in command.  This evidence is not sufficient to create a genuine issue as to whether Capt. Warren discriminated against the plaintiff because of his race.

-15-

**(d)  Lt. Col. Barry**

Finally, the plaintiff offered no evidence of discriminatory intent on the part of defendant Barry.  In addition, the plaintiff testified that he had not heard, and no one else had ever told him that they heard, Barry make any remarks indicating he had a bias against Cuban Americans or Hispanic people.  Nor does the plaintiff offer any evidence that would allow a jury to conclude that Barry took any action motivated by ethnic bias.

**2.    Negative Performance Observation Report: Defendant Stine**

The plaintiff's Section 1981 claim against defendant Stine based on Stine's issuance of the negative Performance Observation Report fails for the same reason that his claim regarding the narcotics dog training school fails.  The plaintiff has not offered admissible evidence of discriminatory intent on the part of defendant Stine based on the plaintiff's race.  In addition, the plaintiff never heard, and no one else ever told him that they heard, defendant Stine make any comments that would indicate a bias against Cuban Americans or Hispanic people.

**3.    Harassment by a Public Verbal Reprimand and the Posting of Ethnically Offensive Drawings: Defendants Woodson, Hourigan, McGuire, and Stine**

The plaintiff contends that he heard Woodson and Hourigan, at different times, discuss with McGuire and Stine how to make the plaintiff want to leave the SNTF.  He claims that the verbal

-16-

reprimand he received from McGuire and the posting of three
offensive drawings were part of a harassment campaign intended to
make him want to leave.  With respect to Woodson, Hourigan and
Stine, the plaintiff has failed to offer any evidence that any of
them were motivated by an intent to discriminate against the
plaintiff on the basis of his race.

With respect to defendant McGuire, the defendant testified
that McGuire sometimes referred to Hispanics as "Paco," (Pl.'s
Dep. 98:20-25) and that he saw McGuire post an ethnically
offensive drawing.  The plaintiff also testified that McGuire
publicly reprimanded him on one occasion, although the plaintiff
acknowledges that the reprimand was based on paperwork that the
plaintiff had incorrectly processed.

The plaintiff does not specify whether his Section 1981
claim against McGuire is a hostile work environment claim or an
adverse employment claim.  However, because the posting of
offensive drawings does not constitute an adverse employment
action, the court construes the claim as one based on a hostile
work environment.  "In order to survive summary judgment [on a
hostile work environment claim] . . . a plaintiff must produce
evidence that the workplace is permeated with discriminatory
intimidation, ridicule, and insult, that is sufficiently severe
or pervasive to alter the conditions of the victim's employment."
Whidbee, 223 F.3d at 69.

-17-

The plaintiff and defendant McGuire were colleagues at the South Central Office of the SNTF from January of 1999 to January of 2001.  During that two year period, there is evidence that McGuire posted one ethnically offensive drawing and gave the plaintiff one public verbal reprimand based on what the plaintiff acknowledges was an error by the plaintiff.  Also, the plaintiff testified that numerous drawings were posted in the room where he saw McGuire post the ethnically offensive poster, that some of the drawings concerned officers who were not members of a racial minority group, and that some of the drawings concerning the plaintiff were complimentary and not ethnically offensive.

The plaintiff has not provided evidence from which a reasonable jury could conclude that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment."  Whidbee, 223 F.3d at 69.

**B.___Claim for Intentional Infliction of Emotional Distress**

The plaintiff's remaining claim is a state law claim for intentional infliction of emotional distress. "The district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C.A. § 1367 (c)(3).  "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers of

-18-

Am. v. Gibbs, 383 U.S. 715, 726 (1966).

While dismissal of the state law claims is not mandatory, Carnegie-Melon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988), when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. Accordingly, the court declines to exercise supplemental jurisdiction over the plaintiff's claim for intentional infliction of emotional distress.

## IV.  CONCLUSION

_____For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 43) is hereby GRANTED.  Judgment shall be entered in favor of the defendants on the plaintiff's Section 1981 claims brought pursuant to 42 U.S.C. § 1983, and the plaintiff's state law claim for intentional infliction of emotional distress is hereby dismissed without prejudice.

The Clerk shall close this case.

It is so ordered.

Dated this 25th day of September 2006, at Hartford, Connecticut.

                              _____/s/ AWT_____
                                Alvin W. Thompson
                              United States District Judge

-19-